420 F.2d 209
 136 U.S.App.D.C. 367
 NATIONAL AVIATION TRADES ASSOCIATION and Butler Aviation
Company, Petitioners,
v.
CIVIL AERONAUTICS BOARD, Respondent, Pan American World
Airways, Inc., Port of New York Authority, Intervenors.
 No. 22602.
 United States Court of Appeals District of Columbia Circuit.
 Argued June 16, 1969.
Decided Oct. 2, 1969.
 
 Mr. John W. Simpson, Washington, D.C., for petitioners. Mr. William C. Burt, Washington, D.C., also entered an appearance for petitioners.
 Mr. Warren L. Sharfman, Associate General Counsel, Litigation and Research, Civil Aeronautics Board, with whom Messrs. Joseph B. Goldman, General Counsel, O. D. Ozment, Deputy General Counsel, J. Michael Roach, Attorney, Civil Aeronautics Board, and Howard E. Shapiro, Attorney, Department of Justice, were on the brief, for respondent.
 Mr. David L. Steege, New York City, was on the brief for intervenor, Pan American World Airways, Inc. Mr. John C. Pirie, New York City, also entered an appearance for intervenor, Pan American World Airways, Inc.
 Mr. Sidney Goldstein, New York City, was on the brief for intervenor, Port of New York Authority.
 Before McGOWAN, TAMM and ROBINSON, Circuit Judges.
 TAMM, Circuit Judge:
 
 
 1
 The basic question presented by this petition is whether the Civil Aeronautics Board erred in approving an agreement between Pan American World Airways, Inc. and the Port of New York Authority, under which the airline would take over control of Teterboro Airport from the Port Authority for a term of thirty years and assume the responsibility of operating this important facility. For the reasons hereinafter stated, we hold that the Board's determination was proper and must be affirmed.
 
 I. THE BACKGROUND OF THE CONTROVERSY
 
 2
 The agreement which precipitated the present controversy arose out of the continuing and increasingly acrimonious battle for airspace in the skies over New York City. During the past few years, rising volumes of traffic at the three major jetports in the New York City area (Newark, La Guardia, and John F. Kennedy International Airports) have caused frequent substantial delays in aircraft operations and have led concerned government and industry groups to propose various measures for alleviating this situation. One suggested method for ameliorating the congestion and delay in the New York area is rapid development of 'reliever' airports to remove general aviation aircraft-- those not engaged in military or scheduled passenger-carrying operations-- from the major jetports. The Port of New York Authority (hereinafter 'Port Authority'), a body created by interstate compact between New York and New Jersey,[1] owns and operates a number of airports in the area which could be developed to divert general aviation traffic from the major jetports. One of these airports is Teterboro, which, because of its existing facilities and proximity to Manhattan, is certain to have a key role in the future development of general aviation in the New York area.
 
 
 3
 In September of 1964, Pan American World Airways, Inc. (hereinafter 'Pan American') communicated to the Port Authority its interest in taking control of Teterboro Airport and developing the existing facilities (J.A. 42). In December of that year, the parties commenced negotiations on the terms of an agreement under which Pan American would become either the operator or the chief tenant at Teterboro (J.A. 42-43, 249-50); despite several interruptions, the negotiations continued for three years. During this time Pan American retained the architectural firm of Tippetts-Abbett-McCarthy-Stratton (TAMS) to make recommendations for the future development of the airport, and TAMS prepared a detailed plan which contemplated that Pan American would make capital expenditures of $22 million for improving Teterboro. Some development of the airport was initiated while the negotiations were in progress; widening and extension of runways was begun under a grant from the Federal Aviation Administration, the terms of which contemplated that Pan American might succeed the Port Authority as operator of Teterboro and assume the obligations attendant on the grant (J.A. 170-77).
 
 
 4
 In September of 1967, the negotiations between Pan American and the Port Authority culminated in an agreement which provided, in general, that Pan American would assume full responsibility for operating Teterboro as a public airport for a period of thirty years, subject to a number of specific limitations which are discussed in greater detail delow; although no commitment for specific improvements was made, the airline also agreed to assume the responsibility for making all investments in new airport facilities during the life of the agreement. In return, the Port Authority would receive a fixed annual fee plus a percentage of all revenues in excess of an agreed-upon minimum. On September 26, 1967, Pan American filed an application with the Civil Aeronautics Board, requesting a disclaimer of jurisdiction with respect to the agreement, or, alternatively, approval under section 408(b) of the Federal Aviation Act, 49 U.S.C. 1378(b) (1964).
 
 
 5
 On December 28, 1967, the Board issued an order setting the matter for expedited hearing because of the urgency of the congestion problem (J.A. 11); objections to the agreement were interposed by Butler Aviation Company (Butler) and the National Aviation Trades Association (NATA), petitioners in this action (J.A. 6-12). Butler is engaged in the aviation services industry at twelve major airports throughout the country, including La Guardia; in the trade it is known as a 'fixed base operator,' or a company which sells and services aircraft and aircraft equipment and provides pilot training, parking and hangar space, and airplane fuel. NATA is a trade association representing a number of relatively small companies in the general aviation services industry; Butler is one of its members.
 
 
 6
 Five days of hearings on Pan American's application were held before a trial Examiner in March of 1968, and briefs were filed by interested parties during the following month. On May 10, 1968, the Examiner issued an initial decision which found that the agreement was not inconsistent with the public interest and should be approved (J.A. 430-66). Butler and NATA petitioned the Civil Aeronautics Board for discretionary review of this decision (J.A. 467-69), and on September 25, 1968, the Board issued an order granting review 'without further proceedings' as provided in its Rules of Practice, 14 C.F.R. 302.28(d) (1969) (J.A. 475). The same order unanimously adopted most of the Examiner's findings and approved the agreement, subject to imposition of an additional condition (J.A. 476-99). Butler and NATA then filed with the Board petitions for reconsideration, alleging that the complexity of the case demanded a more extensive review which should include the opportunity to present briefs and oral arguments. On December 5, 1968, the Board issued an order denying the petitions for reconsideration (J.A. 505-11). Shortly thereafter Butler and NATA filed a petition for review in this court, alleging a variety of substantive and procedural errors in the Board's determinations.
 
 II. ANTITRUST CONSIDERATIONS
 A. The Board's Duty
 
 7
 Most of the significant questions presented by this petition involve the impact of the proposed agreement upon federal antitrust policies. The duty to weigh antitrust considerations is imposed on the Board by section 408(b) of the Federal Aviation Act, 49 U.S.C. 1378(b) (1964), which provides in pertinent part:
 
 
 8
 Any person seeking approval of a * * * lease, operating contract, or acquisition of control, specified in subsection (a) of this section, shall present an application to the Board, and thereupon the Board shall notify the persons involved * * * and other persons known to have a substantial interest in the proceeding, of the time and place of a public hearing. Unless, after such hearing, the Board finds that the * * * (agreement) will not be consistent with the public interest or that the conditions of this section will not be fulfilled, it shall by order approve such * * * (agreement), upon such terms and conditions as it shall find to be just and reasonable * * *: Provided, that the Board shall not approve any * * * purchase, lease, (or) operating contract * * * which would result in creating a monopoly or monopolies and thereby restrain competition or jeopardize another air carrier not a party to the (agreement) * * *.
 
 
 9
 Several features of this section deserve explication. First, the form of the italicized language quoted above is significant; on its face, it seems to create a presumption that mergers, consolidations, and similar agreements containing anticompetitive features must be approved unless the Board can make specific findings that they are antithetical to the public interest. See Northwest Airlines, Inc. v. CAB, 112 U.S.App.D.C. 384, 389, 303 F.2d 395, 400 (1962). Second, it seems clear that the Board's investigation into antitrust considerations must take place on two levels. The first branch of the inquiry is outlined by the proviso concerning monopolies quoted above. In Butler Aviation Co. v. CAB, 389 F.2d 517, 519 (2d Cir. 1968), it was pointed out that this proviso is not applicable unless the Board finds both that the agreement will create a monopoly and that the monopoly will either restrain competition or jeopardize a non-party carrier.
 
 
 10
 Once the Board finds that the monopoly proviso is inapplicable, however, it must then embark upon the second branch of the antitrust inquiry which encompasses anticompetitive effects less drastic than monopolization. This duty arises from the explanation of the 'public interest' standard set forth in section 102(d) of the Act, 49 U.S.C. 1302(d) (1964), and presumably from the inclusion of this same term in section 408. Butler Aviation Co. v. CAB, 389 F.2d 517, 519 (2d Cir. 1968). According to the Butler case, this inquiry involves a balancing of the loss resulting from restraints on competition against the public benefits flowing from approval of the agreement (Id.). Finally, the need for such a detailed investigation is explained by the fact the Board's approval of an agreement under section 408 confers immunity from the antitrust laws by virtue of section 414 of the Act, 49 U.S.C. 1384 (1964).
 
 
 11
 Petitioners contend that the Board erred in both halves of its antitrust inquiry by rejecting various market definitions propounded by Butler and NATA, all of which allegedly would vitate the agreement under section 408. We shall examine each of these proposed market definitions; first, however, it is appropriate to remark upon the standard of review which this court should apply. Petitioners assert that antitrust matters are not within the scope of the Civil Aeronautics Board's particular expertise, and thus the Board's determinations in this area are entitled to scant deference on review (Reply Brief for Petitioners at 8-9). As an abstract matter, it seems reasonable to conclude that courts are at least as proficient as the Civil Aeronautics Board in interpreting the antitrust laws; in the circumstances of this case, however, we feel that there is reason to accord the Board's findings some deference. Many of the key questions in this action are matters of market definition, and, as the Supreme Court indicated in Brown Shoe Co. v United States, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962), the process of defining a product market often involves inquiry into economic realities and industry practice.
 
 
 12
 The boundaries of * * * a (product) submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors.
 
 
 13
 370 U.S. at 325, 82 S.Ct. at 1524; see also Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320, 327-33, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961). We think that the Board does possess sufficient experience in evaluating the 'practical indicia' of the aviation industry to be accorded substantial deference in its market findings. Petitioners seek to foreclose this rationale, however, by arguing that the Board's expertise extends only to matters regarding the operations of scheduled air carriers, and not to the problems of general aviation and airport operations (Reply Brief for the Petitioners at 10; cf. Brief for the Petitioners at 57-58). We do not find this contention persuasive. While it may be true that the Civil Aeronautics Board is less expert in questions concerning general aviation than it is in matters affecting the scheduled air carriers, it seems equally true that the Board is on more intimate terms with the economics of general aviation and its related industries than are the members of this court. Therefore, we feel that the Board's findings in this regard are entitled to a presumption of validity. See North Central Airlines, Inc. v. CAB, 105 U.S.App.D.C. 207, 210, 265 F.2d 581, 584, cert. denied, 360 U.S. 903, 79 S.Ct. 1285, 3 L.Ed.2d 1254 (1959). With this standard in mind, then, we proceed to an examination of petitioners' proposed market definitions.
 
 B. Teterboro Airport as a Possible Market
 
 14
 Petitioners begin their sweeping attack under the section 408 proviso by contending that 'Teterboro is itself a significant market' which is monopolized under the agreement (Brief for the Petitioners at 37-38). This rather cryptic assertion is not explained in the briefs or the record on appeal (cf. J.A. 455); presumably it is an attempt to describe a market narrower than 'general aviation airports serving the New York City area,' since that is the basis of the petitioners' next argument. We see no reason for characterizing Teterboro Airport as a monopoly for purposes of section 408, and petitioners certainly have not provided any; as will be seen in the following section, there are a number of airports in and around New York City which are capable of accommodating general aviation operations and facilities.
 
 
 15
 C. General Aviation Airports in the New York City Area
 
 
 16
 A more substantial argument centers around petitioners' assertion that Teterboro Airport is such a key facility that control over it confers effective monopoly power over general aviation in the New York area. More specifically, petitioners contend that 'Teterboro's status as the only airport serving general aviation exclusively, capable of accommodating high-performance aircraft, and located within a 25 mile radius of midtown Manhattan, affords it such prominence among New York area general aviation airports' that Pan American will have a monopoly of 'general aviation airports' serving New York (Brief for Petitioners at 37). The Examiner rejected this contention (J.A. 455-456), and the Board adopted his findings (J.A. 492). We think that this disposition was reasonable and supported by the record.
 
 
 17
 It seems clear that the Examiner declined to define the relevant line of commerce and the geographic market as narrowly as the petitioners desired. Specifically, the Examiner did not limit his inquiry to those airports which are devoted exclusively to general aviation (J.A. 456); rather, he included the three major jetports which, as we noted above, still serve general aviation and are likely to do so in a rather substantial degree for some time to come. The examiner also referred to the existence of a number of other airports serving general aviation on the outskirts of New York City, and these other facilities were exhaustively described in the briefs, exhibits, and arguments presented during the proceedings. In this regard, the Examiner obviously did not ascribe determinative significance to the fact that not all of these other airports are capable of accommodating high performance aircraft. We find that this was a permissible exercise of discretion, since the relevant authority indicates that product interchangeability is not the sole criterion for determining whether economic competition exists among given products and services.[2]
 
 
 18
 Another factor which clearly entered the Examiner's deliberations was the strong likelihood that the outlying reliever airports will be improved, some gaining the capability to accommodate high-performance aircraft, as the struggle for airspace over New York City intensifies in the future. This probable development of reliever airports should also serve to extend the relevant market area. The record indicates that under the present and foreseeable state of the technology associated with aircraft flight control, the airports immediately surrounding New York City will not be able to accommodate all of the aircraft operations forecast during the term of the Teterboro agreement; as a result, some of those desiring to operate aircraft in the New York City area will almost certainly have to settle for facilities farther and farther removed from the city. In the light of this compelling impetus toward market entry and expansion, we cannot say that the Examiner and the Board erred in finding that the Teterboro agreement would not create a monopoly of general aviation airports in the New York City area.
 
 
 19
 D. Sale of High Performance Aircraft in the New York Area
 
 
 20
 The Petitioners also contend that the Teterboro agreement violates the section 408(b) proviso by creating a monopoly in 'the sale of high performance executive jet aircraft in the New York area' (Brief for the Petitioners at 40). This contention is premised on the fact that Pan American is the exclusive American distributor of the Fan Jet Falcon aircraft, and currently bases demonstrator models for the New York market at Westchester County Airport, twenty-six miles from Manhattan. However, Pan American has expressed its intention to transfer its Falcon sales operations to Teterboro if the agreement is approved (J.A. 59-60); petitioners argue that this intention, together with Pan American's control over Teterboro, will restrain competition in the sales of high performance aircraft.
 
 
 21
 The Examiner found that this argument 'assumes that Pan American will squeeze out Atlantic Aviation Corporation, which is a distributor of such aircraft (at Teterboro), and that Teterboro is so important that no one else will be able to compete in the New York area.' These assumptions, the Examiner found, were not supported by the evidence; on the contrary, he pointed out, 'Pan American competes now for this market with a facility at Westchester. Teterboro is a good location; but the record does not show that its control results in control of the New York area for the sale of aircraft' (J.A. 457). The Board adopted this finding, saying that 'even to the extent that Pan American were to become the exclusive distributor of high performance executive jet aircraft at Teterboro, there is no showing on this record that this would result in any substantial restraint on competition in the sale of such aircraft * * *' (J.A. 490). We think that these conclusions were reasonable and supported by the record.
 
 
 22
 As the Board emphasized, the agreement contains a number of provisions designed to prevent Pan American from engaging in anticompetitive practices (see part F, infra). Even if we accept the petitioner's contention that these safeguards will not be effective in restricting Pan American's control over aircraft sales activities at Teterboro, however, there is little to indicate that the result will be a monopoly within the meaning of section 408(b). The description of Pan American's sales procedure contained in the record suggests that the location of demonstrator aircraft is not a crucial factor in determining control over the high performance aircraft market:
 
 
 23
 Currently, Pan American's demonstrator Falcon aircraft are based at (ten locations throughout the country including) * * * Westchester County Airport. Its main sales and leasing efforts, however, are conducted from its main office at the Pan Am Building in New York City. Demonstrations of the Falcon aircraft are made at airports throughout the United States where there are prospective purchasers or lessees.
 
 
 24
 (J.A. 59.) A similar description of the market for high performance executive aircraft can be found in Butler Aviation Co. v. CAB, 389 F.2d 517, 520 (2d Cir. 1968):
 
 
 25
 Executive jets vary substantially in capacity, takeoff weight, speed, range and price-- the latter running from $500,000 to $3,100,000. A corporation considering such a purchase is likely to make a rational and well-considered choice as to which airplane best suits its requirements rather than yield to salesman's blandishments.
 
 
 26
 Thus, there seems scant liklihood that a slight gain in proximity to metropolitan New York will confer monopoly power over the executive jet market on Pan American.
 
 
 27
 Petitioners further contend that Pan American could obtain a competitive advantage by providing service facilities for its Falcons at Teterboro, and then exerting its leverage as airport operator to prevent the establishment of maintenance facilities for competing aircraft. This contention is based upon a memorandum from one Pan American official to another, which expresses concern that Atlantic Aviation Company, a fixed base operator at Teterboro and a distributor of competing executive jet aircraft, might accord Falcon owners low priority for service. The memorandum further observes that the demand at Teterboro should exceed the supply of services which one fixed base operator can provide, and it recommends that Pan American appoint two service operators at Teterboro, one of which will be 'capable of performing major Falcon services' (J.A. 274).
 
 
 28
 We cannot base a finding of monopoly on this momorandum and several rather dubious inferences from other equivocal evidence contained in the record. The question of whether the availability of service facilities is a crucial consideration in the market for executive jet aircraft-- a factor sufficiently important to confer market dominance-- is a complex factual issue which cannot be reviewed properly without a full discussion, supported by evidence, in the proceedings before the Board. Such a discussion is lacking in the record on appeal, and we have found nothing to indicate that this argument was ever articulated clearly before the Examiner or the Board. However, the available evidence shows that this line of attack possesses little merit. The numerous restrictions incorporated in the agreement (see part F, infra), particularly the provision prohibiting Pan American from becoming a fixed base operator at Teterboro,[3] together with the availability of other airports in the general area and Pan American's announced intention to have two service operators at Teterboro, make it highly unlikely that Pan American will obtain a monopoly in the sale of executive jet aircraft through its operation of Teterboro.
 
 
 29
 E. The Market for Passengers Connecting to Air Carrier Flights Through Teterboro
 
 
 30
 Petitioners' final attack under the section 408(b) proviso concerns passengers traveling by helicopter and air taxi from Teterboro to one of the major airports for the purpose of connecting with an airline flight. Petitioners argue that Pan American may be able to use its position as operator of Teterboro to discourage these passengers from connecting with flights of other airlines, through the use of anticompetitive techniques such as excluding from Teterboro air taxis which fly to the terminals of other airlines (Brief for the Petitioners at 44). Petitioners also point to the fact that Pan American owns nearly thirty per cent of the stock of New York Airways, a helicopter carrier in the New York City area (J.A. 232).
 
 
 31
 The Examiner expressed doubt as to whether the market of connecting passengers was economically significant, citing a study of Teterboro patrons which showed that less than one per cent of those interviewed who had arrived at Teterboro by air were destined for John F. Kennedy International Airport (J.A. 456). In any event, the Examiner concluded that the provisions of the agreement were sufficient to prevent Pan American from obtaining a monopoly in this fashion (J.A. 457); the Board affirmed this determination and added the further observation that it probably would not be economically feasible for Pan American to limit air taxi and helicopter operations to those passengers destined for Pan American's flights (J.A. 490-91). We find no error in these conclusions.
 
 
 32
 Helicopter operations in the New York City area have a long history of financial difficulties, and New York Airways (NYA) has required a constant stream of subsidies to survive; at first these subsidies emanated from the Federal Government, but in recent years Congress has cut off the flow of funds. As a result, NYA has been forced to enter agreements with the fixed-wing carriers, notably Pan American and TWA, under which the airlines advanced capital and received in return interests in the assets of NYA and the right to have helicopter flights stop at their terminals. The Civil Aeronautics Board has approved these arrangements because of the public interest in maintaining helicopter service. See generally New York Airways, Inc., CAB Docket No. 15661 (Initial Decision, Feb. 16, 1966); cf. National Capital Airlines, Inc. v. CAB, 136 U.S.App.D.C. , 419 F.2d 668 (1969).
 
 
 33
 The Teterboro agreement is consistent with the Board's previous attempts to maintain NYA's helicopter service on a common carriage basis. Section 26(e) of the agreement provides in part:
 
 
 34
 The use of the (Teterboro) Airport for helicopter flights, whether scheduled or not, and all activities * * * in connection with said helicopter flights, will at all times be conducted on a fair, equal and not unjustly discriminatory basis with respect to all persons wishing to use any of the same and to all airlines wishing to participate in such arrangements, activities and accommodations * * *.
 
 
 35
 It is understood * * * that the sale of passage and service for scheduled flights at other airports when in conjunction with the sale of passage on helicopters * * * will at all times be available on a fair, equal and not unjustly discriminatory basis to all airlines wishing to participate in such arrangements * * *.
 
 
 36
 (J.A. 121-22). The penalty for violation of this clause is forfeiture of Pan American's interest under the agreement (J.A. 101-103); and it seems highly unlikely that Pan American would jeopardize its Teterboro operation for what promises to be, at best, a rather minuscule gain in passengers for its airline flights. Therefore, even if the traffic in passengers connecting by helicopter from Teterboro to scheduled air carriers is deemed a significant market for purposes of the antitrust law, it seems that the Board was amply justified in concluding that any resulting 'monopoly' would not meet either of the other two criteria needed to trigger the operation of the section 408(b) proviso. Nonparty air carriers should not be adversely affected, since their ability to enter the market is preserved under the agreement; and, given the financial forces affecting Pan American's decisions, competition for connecting passengers is not likely to be reduced from its present level by virtue of the agreement.
 
 
 37
 F. Anticompetitive Effects and the Public Interest
 
 
 38
 Petitioners launch another series of attacks based on the theory that the Board erred in concluding that the alleged anticompetitive effects of the agreement would be outweighed by the public interest in having Pan American develop and operate Teterboro. This is not to say, however, that the petitioners dispute the desirability of assuring rapid development of reliever airports such as Teterboro; indeed, the urgency of the congestion proglem is one of the few facts upon which all of the parties agree, and it was a key factor in the Board's decision to approve the Teterboro agreement.
 
 
 39
 Some idea of the magnitude of this problem can be gained from a congressional committee's finding that within the next decade airline passenger traffic will probably triple, while the number of general aviation aircraft will double. Aviation Subcomm. of the Senate Comm. on Commerce, Interim Report on the National Airport System, 90th Cong., 2d Sess. 4 (1968) (hereinafter Interim Report). This condition will create a need for airport development funds in excess of five billion dollars, and 'the amount required in the New York City area alone will in all probability exceed three-quarters of a billion dollars' (Id. at 5). Notwithstanding these grim statistics, however, the petitioners contend that the public benefits resulting from the agreement are 'illusory' and that the Port Authority would undertake a comparable development program if the agreement were not approved (Brief for Petitioners at 49-52). We find that the Board was justified in rejecting this argument.
 
 
 40
 Petitioners rely chiefly on testimony by the Port Authority's Director of Aviation, in which he responded affirmatively when asked whether the Port Authority would 'seriously consider extensive development' of Teterboro if the agreement were disapproved, and whether the Authority had 'sufficient resources to achieve such a development' (J.A. 371-72). However, the witness further stated that in the Port Authority's estimation, Pan American was 'qualified to promote and fully develop Teterboro over the shortest interval of time'; specifically, Pan American has a detailed plan for improving Teterboro, whereas the Port Authority does 'not have any specific plans that we could pull off the shelf at this moment' (J.A. 372). In addition to the gain in time resulting from the existence of the TAMS plan, it is also quite likely that Pan American can devote more capital to the improvement of Teterboro in a shorter period of time than the Port Authority could. The record reveals that in the twenty years that the Port Authority has operated Teterboro, it has invested approximately ten million dollars-- a figure which includes the initial cost of purchasing the facility (J.A. 345); Pan American proposes to invest roughly twice that amount in less than five years. The nationwide need for a 'sudden surge of capital' for airport development was discussed in the Senate Commerce Committee's Interim Report, supra. In that Report, the Aviation Subcommittee expressed 'some doubt that this quantity of money will be available on the private bond market if all airports seek to raise it at the same time'; this condition, the Subcommittee stated, 'could present problems for the airports in the major metropolitan areas, even though their revenue generating capability is sufficient to pay off revenue bonds over a long period of time' (Id. at 13). This position was presented to the Board by the Department of Transportation in a brief which stated that 'expansion of private investment in airport development will benefit the entire aviation community and it is the Department's policy to encourage it wherever possible' (J.A. 323). Thus, every public agency or official that has had occasion to consider the Teterboro agreement-- including the Port Authority,[4] the Department of Transportation, the governors of New York and New Jersey,[5] the Examiner, and the Civil Aeronautics Board-- has found that it will further the public interest by assisting in the rapid development of Teterboro as a reliever airport. In these circumstances, we cannot characterize the benefits of the Teterboro agreement as 'illusory.'
 
 
 41
 Petitioners also assert that the Board must be reversed because it did not make an adequate inquiry into possible alternative arrangements that would secure the same public benefits without anticompetitive consequences. As the Examiner noted, the relevant authority does not provide an unequivocal answer to the question of whether every administrative agency empowered to approve agreements containing anticompetitive features must on its own initiative undertake an investigation into possible alternative means of achieving the desired results. (J.A. 458-59; cf. United States v. Third National Bank in Nashville, 390 U.S. 171, 88 S.Ct. 882, 19 L.Ed.2d 1015 (1968); Marine Space Enclosures, Inc. v. FMC, 137 U.S.App.D.C. , 420 F.2d 577 (1969).) However, we need not reach that question since the Examiner reasonably concluded that the instant proceedings would satisfy an 'alternative means' test. Here, the alternatives were clear: rapid development by Pan American to alleviate an urgent problem, or substantial delays while new plans and sources of funds were sought. We are convinced that the Examiner and the Board were fully cognizant of all the alternatives that were reasonably available to them.
 
 
 42
 Finally, the petitioners contend that the Board erred in concluding that the alleged anticompetitive effects of the agreement were slight and would be outweighed by the public benefit resulting from approval. One of the supposedly serious anticompetitive effects cited by the petitioners is the control which Pan American will have over charges for landing fees and other services at Teterboro. This power, they assert, will enable Pan American to cut prices until competing airports are driven out of business, thereby giving Pan American a monopoly and the power to raise prices (Brief for Petitioners at 15). Similarly, petitioners contend that Pan American will have extensive control over leases and operating agreements with companies that provide services at Teterboro; the typical agreement with a fixed base operator, according to petitioners, is terminable on short notice, and, in any event, the airport operator will have extensive power to damage disfavored service companies during the negotiation of operating agreements. This power is significant, they assert, because there is a substantial conflict of interest between Pan American as an airline carrier and the General aviation community. This conflict arises from the struggle for airspace and airport facilities in the New York City area, according to petitioners, and will be waged for many years before various branches of the state and federal governments; by virtue of its control over Teterboro leases and franchises, the petitioners state, Pan American will be able to coerce silence or acquiesence from its tenants, and thereby subvert the 'fundamental, economic and social policy that antitrust law seeks to foster' (Brief for Petitioners at 24).
 
 
 43
 The Examiner and the Board found a number of reasons to discount these alleged dangers. First, the economics of the situation serve to minimize any conflict of interest. Pan American will make sizeable investments in Teterboro, and it is doubtful that even a company as large as Pan American could afford to jeopardize this capital by adopting a program designed to curtail general aviation operations at Teterboro-- a program which would reduce its return on capital invested at Teterboro while not affording Pan American any competitive advantages in relation to other air carriers, since presumably any gains in airspace and facilities achieved by curtailing general aviation in the New York area would be shared by other scheduled air carriers. Similarly, Pan American and the general aviation community have a common interest rather than a conflict insofar as both desire the rapid development of attractive and efficient reliever airports which can divert general aviation from the jetports.
 
 
 44
 Even if Pan American were motivated to engage in anticompetitive practices, however, there are a number of provisions in the agreement which are designed to prevent it from doing so. The agreement requires Pan American to operate Teterboro as a public airport (J.A. 106) and to offer all services which it may provide under the agreement 'on a fair, equal and not injustly discriminatory basis to all users * * * and (to) charge fair, reasonable and not unjustly discriminatory prices for all such services' (J.A. 121). There is a similar provision under which Pan American covenants that it 'will not enter into any agreement or understanding, relating to services at the Airport whether or not binding, * * * which will have the effect of fixing rates, of lessening or preventing competition, or creating a monopoly' (J.A. 121). More specific provisions govern landing fees and operating agreements. If Pan American desires to raise landing fees above the rate prevailing at Port Authority facilities on September 19, 1967, it must obtain approval from the Port Authority (J.A. 499); approval is also required for any agreement concerning use or occupancy of the airport (J.A. 93). In addition, Pan American is prohibited from making rules and regulations which are inconsistent with those promulgated by the Port Authority (J.A. 90). The penalty for violation of these provisions is termination of the agreement (J.A. 103). Furthermore, by virtue of the agreement (J.A. 89) and Pan American's succession to the Federal Aviation Administration grant (see part I, supra), Pan American is subject to the antidiscrimination provisions of 49 U.S.C. 1110(1), 1349(a) (1964). The Civil Aeronautics Board has also retained jurisdiction over the agreement to assure that no anticompetitive practices occur and to impose additional conditions if unforeseen contingencies arise (J.A. 499). In light of these extensive restrictions, we cannot say that the Board erred in concluding that the possibility of anticompetitive results was slight, and far outweighed by the public benefits inherent in the agreement.
 
 
 45
 Finally, only a few words need be said about petitioners' contention that the Board erred in permitting an important public airport to be turned over to a private company (Brief for the Petitioners at 30-35). This argument seems dubious on its face, in light of the fact that privately-owned airports outnumber public facilities in this country by a ratio of nearly two to one;[6] moreover, as noted above, the Department of Transportation has concluded that private development of airports is essential to meet the dramatic expansion of air traffic in the coming years. Nonetheless, petitioners claim that the agreement is dangerous because it allows Pan American to choose among general aviation uses for Teterboro solely on the basis of which kinds of operations are most profitable rather than on the basis of public interest; thus, it is suggested that Pan American intends to phase out student pilot practice flights in favor of more profitable large-aircraft operations. If the affected government bodies determine that it is in the public interest to maintain pilot training or other unprofitable operations at Teterboro, however, it does not seem unlikely that some form of subsidy other than operation of the airport could be devised; and, as noted above, Pan American's ability to discriminate among various airport users is limited by the terms of the agreement. Both the Examiner and the Board evaluated the propriety of entrusting Teterboro to private enterprise, and concluded that the public benefits far outweighed any threatened detriment; since these findings are supported by substantial evidence, we cannot disturb them.
 
 III. PROCEDURAL OBJECTIONS
 
 46
 Petitioners' final contention is that the Board's procedure in reviewing the Examiner's decision 'without further proceedings'-- without affording the petitioners the opportunity to present briefs and oral argument to the full Board-- was reversible error. This assertion is premised on section 1004(a) of the Federal Aviation Act, 49 U.S.C. 1484(a) (1964), which states that 'In all cases heard by an examiner or a single member the Board shall hear or receive argument on request of either party.' The Board, on the other hand, emphasizes several provisions designed to give it substantial discretion in structuring its proceedings. Thus, the general rule is set forth in section 1001 of the Act, 49 U.S.C. 1481 (1964): 'The Board and the Administrator, subject to the provisions of this chapter and the Administrative Procedure Act, may conduct their proceedings in such manner as will be conducive to the proper dispatch of business and to the ends of justice.' The Board's discretionary power over procedural matters is further reinforced by Reorganization Plan No. 3 of 1961, 75 Stat. 837, which provides in part:
 
 
 47
 (a) In addition to its existing authority, the Civil Aeronautics Board * * * shall have the authority to delegate, by published order or rule, any of its functions to * * * a hearing examiner * * *.
 
 
 48
 (b) With respect to the delegation of any of its functions, * * * the Board shall retain a discretionary right to review the action of any such * * * hearing examiner * * * within such time and in such manner as the Board shall by rule prescribe * * *.
 
 
 49
 (c) Should the right to exercise such discretionary review be declined * * * then the action of any such * * * hearing examiner * * * shall, for all purposes, including appeal or review thereof, be deemed to be the action of the Board.
 
 
 50
 Pursuant to this authority, the Board has promulgated rules governing discretionary review procedures. See generally 14 C.F.R. 302.28 (1969). This section clearly states that review of an initial decision 'is not a matter of right but of the sound discretion of the Board,' and that the grounds for review are limited to those enumerated. Furthermore, subsection (d)(2)(i) of this section states that the Board may issue orders limiting the issues which will be considered on review.
 
 
 51
 Even before the adoption of Reorganization Plan No. 3, this court recognized the Civil Aeronautics Board's need to retain some flexibility in its procedures. Thus, in Sisto v. CAB, 86 U.S.App.D.C. 31, 38, 179 F.2d 47, 54 (1949), we stated that the language in section 1004(a) directing the Board to hear or receive argument 'does not bind them to do it in any particular manner.' See also Walker v. CAB, 251 F.2d 954 (2d Cir. 1958). In Capitol International Airways, Inc. v. CAB, 129 U.S.App.D.C. 187, 193, 392 F.2d 511, 517 (1968), we found that by virtue of Reorganization Plan No. 3, 'the power to grant or deny review of the initial decision is entrusted by law and regulation to the Board.' Since the Board presumably could have denied review altogether, then, it seems to follow that petitioners have little cause to complain because the Board granted a limited review that did not encompass formal briefs and oral argument.
 
 
 52
 Apart from the logic of the relevant statutes and regulations, there are substantial reasons to conclude that the Board did not abuse its discretion in this case by reviewing without further proceedings. The subject matter of the controversy obviously was intimately related to the problem of relieving congestion in the skies over New York City, and thus it must have been clear to all parties that time was of the essence. Indeed, in its order setting the matter for public hearing the Board noted the 'substantial public interest in resolving the issues presented as speedily as possible,' and concluded: 'We are directing that this proceeding be set down for hearing promptly, and that it be expedited by the hearing examiner at all stages of the proceeding' (J.A. 11). Moreover, by the time that the Board ruled upon NATA's petition for reconsideration, it had been presented with a voluminous record, eighty-one pages of briefs which the petitioners filed with the Examiner, over thirty pages of petitions to review, and, finally, the petitions for reconsideration (J.A. 506-07). In passing upon the adequacy of a hearing afforded by an administrative body, we examine not only the form of the proceedings before the agency, but also the substance and completeness of the agency's appraisal of facts and issues, taking account of exigent or unusual circumstances which would justify deviations from customary practice. See Citizens for Allegan County Inc., v. FPC, 134 U.S.App.D.C. 229, at 231-235, 414 F.2d 1125, at 1127-1131 (1969).[7] Our review of the record convinces us that the Civil Aeronautics Board was fully appraised of all of petitioners' substantial arguments, and that it did not abuse its discretion in matters of substance or procedure. Therefore, the Board's order must be
 
 
 53
 Affirmed.
 
 
 
 [1]
 In Bergen County v. Port of New York Authority, 32 N.J. 303, 306, 160 A.2d 811, 812 (1960), the Port Authority is described as 'a doby corporate and politic created by a compact between the States of New Jersey and New York * * * with the consent of the Congress of the United States. (42 Stat. 174.) It is an agency of both states to further their common interests * * *.' The scope of the Port Authority's power is set forth as follows in New Jersey v. D'Aquino, 56 N.J.Super. 230, 152 A.2d 377 (App.Div.), certif. denied, 30 N.J. 603, 154 A.2d 675, cert. denied, 361 U.S. 944, 80 S.Ct. 407, 4 L.Ed.2d 363 (1969):
 The Legislatures of New York and New Jersey have envisaged and approved the exercise by the Port Authority of the widest range of managerial latitude in the field of air terminal operations, providing that the Authority should have 'sole discretion' over 'all details of financing, construction, leasing, charges, rates, tolls, contracts and the operation of air terminals * * * controlled by (it)' and that 'its decision in connection with any and all matters concerning such air terminals shall be controlling and conclusive.' N.J.S.A. 32:1-35.10.
 
 
 [2]
 Cf. Section of Antitrust Law of the American Bar Association, Antitrust Developments 1955-1968, at 68-69 (1968):
 The (Supreme) Court has not rested submarket definition on a simple 'peculiar characteristics and uses' standard. Rather, by including as submarket indicia 'distinct customers,' 'distinct prices,' and 'sensitivity to price changes,' it has recognized that there may be substitute products so closely related to the product in question as to require that they be included within the same 'economically significant submarket.' * * * On the other hand, functional interchangeability alone is plainly not sufficient * * *.
 Also pertinent to product market definition is the question whether there is productive capacity presently devoted to other products that should be included within the relevant market.
 
 
 [3]
 The following provision was imposed by the Board as a condition of approval of the agreement (J.A. 499):
 Except in connection with aircraft which it may sell, own or operate, or on a casual, infrequent or emergency basis, Pan American will not engage in the aviation service business at Teterboro airport; provided however, that Pan American may provide such services for a period up to 90 days if necessitated by failure of persons normally engaged in such activities to provide such services.
 
 
 [4]
 It is true that a determination of the public interest by the Port Authority is not conclusive of the public interest inquiry that the Board is required to make under section 408(b) of the Federal Aviation Act; obviously, the Port Authority is not charged with the duty of implementing the federal antitrust laws, and the Board must make an independent investigation of antitrust considerations once its jurisdiction attaches under section 408. That is not to say, however, that the Board should completely disregard the Port Authority's findings. The fact that the public agency controlling Teterboro has determined that the agreement with Pan American will best serve the public, and the reasons it gave for this determination, are helpful indicators of the strength of the public interest in approval of the agreement, and the Board must balance this interest against the possible anticompetitive effects of the agreement
 
 
 [5]
 J.A. 337; see also id. at 229
 
 
 [6]
 See Hearings on Maintenance of an Adequate Airport System Before the Aviation Subcomm. of the Senate Comm. on Commerce, 90th Cong., 1st Sess. 24 (1967) (Statement of William F. McKee, Administrator, Federal Aviation Administration): 'In the United States today we have a network of 3,714 publicly owned airports. * * * In addition to these airports, there as 6,222 privately owned facilities; 3,000 of these private airports are open and available to the public * * *.'
 
 
 [7]
 In Marine Space Enclosures, Inc. v. FMC, 137 U.S.App.D.C. , 420 F.2d 577 (1969), we indicated that when an administrative body is faced with a problem in which time is of the essence, the appropriate procedure is to schedule an expedited hearing, even though the case involves complex antitrust considerations. That is exactly what the Civil Aeronautics Board has done in this instance